UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| NATHANIEL KEITH WATTY, | ) | Civil Action No.: 4:10-cv-2056-MGL-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| | ) | |
| SHERIFF OF CLARENDON COUNTY; | ) | **REPORT AND RECOMMENDATION** |
| RANDY GARRETT, JR., SHERIFF; | ) | |
| PETER SURETTE, CAPTAIN; | ) | |
| BRANDON BRAXTON, DEPUTY | ) | |
| SHERIFF; CURTIS HICKMAN, DEPUTY | ) | |
| SHERIFF; PAT COKER and KIP | ) | |
| COKER, DEPUTY SHERIFF; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Plaintiff, who is proceeding pro se in this action, brings this civil rights action alleging

violations of his Fourth, Fifth, and Fourteenth Amendment rights.   Presently before the Court are

Plaintiff's Amended Motion for Summary Judgment (Document # 155)[1] and Defendants' Motion for

Summary Judgment (Document # 156).   All pretrial proceedings in this case were referred to the

undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule

73.02(B)(2)(e), DSC.   Because these motions are dispositive, this Report and Recommendation is

entered for review by the district judge.

---

[1]Plaintiff originally filed a Motion for Summary Judgment (Document # 147) and then filed
the Amended Motion for Summary Judgment (Document # 155).   The original Motion for
Summary Judgment (Document # 147) is moot but will be incorporated into the Amended Motion.

## II.    FACTS

Plaintiff was stopped on the morning of June 16, 2010[2], while traveling on Interstate 95 in Clarendon County after Defendant Brandon Braxton noticed that a light on Plaintiff's car was not functioning. Braxton Aff. ¶ 2; Plaintiff Dep. pp.66-69. After approaching Plaintiff's driver's door, Braxton began to notice signs of possible criminal activity. Braxton Aff. ¶ 5.  Plaintiff's car appeared to be "lived-in," Plaintiff was disheveled, and Plaintiff appeared to Braxton to be nervous and evasive in answering simple questions. Id. at ¶5–8; Braxton Dep. pp.16–18; Plaintiff Dep. p.106.  Braxton averred that he had been trained to observe signs of possible criminal activity on a drug corridor like I-95.  Braxton Aff. ¶ 6.  Plaintiff's car had license plates from New York, and Defendant Braxton was aware I-95 is a known route for drug carriers between Florida and New York.  Id. at ¶¶ 6-10.  Braxton also avers that Plaintiff had three cell phones in plain view in the center of the vehicle.  Id. at ¶ 8; Braxton Dep. p. 17.  However, Plaintiff asserts in his Response to Defendants' Motion for Summary Judgment that two of his three cell phones were located in one of his bags and were not discovered until after the officers searched his bags.  Response (Document # 176) pp. 10, 11; see also Plaintiff Dep. p. 106.

After Braxton stopped Plaintiff, Plaintiff asked if he could look at the light that was out. Plaintiff Dep. p. 67.  Plaintiff noticed that the light looked dim, but it was not out.  Plaintiff Dep. pp. 67-68.  As he exited his vehicle, Plaintiff continued to act very nervous, telling Braxton that he had

---

[2]Plaintiff avers in one Affidavit that the traffic stop occurred at "approximately 0700." Plaintiff Aff. I ¶ 3 (attached as an exhibit to Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Document # 176)).  In another Affidavit, Plaintiff avers that the stop occurred at "approximately 08:00 hours.  Plaintiff Aff. II ¶ 1 (attached as an exhibit to Plaintiff's Response).  The public warning issued to Plaintiff does not list a date or time of the traffic stop.  Public Warning (attached as Ex. A to Plaintiff's Response).  Braxton refers to the CAD Report in his Affidavit, which indicates that the traffic stop began on June 16, 2010, at 7:11:38.  Braxton Aff. ¶ 2; CADVisor (attached as Ex. B to Plaintiff's Response).

his car inspected before he left New York, because he could not be getting stopped.  Id. at ¶ 9; Plaintiff

Dep. pp.67-68.  Plaintiff indicated he was going to pick up his kids in Albany, Georgia, and Braxton

noted that I-95 was not the most direct route to Albany from New York.  Braxton Aff. ¶ 10;  Surrett

Dep. p.6. In addition, Plaintiff could not say exactly where in Albany he was going. Braxton Aff. ¶ 10.

Furthermore, Braxton asked questions about his kids, and Plaintiff had difficulty providing answers

about them, even making Braxton repeat his questions. Id. at ¶ 11.

Plaintiff also notified Braxton that he was a law enforcement officer and showed him his badge

and two other pieces of identification along with his license and registration.  Plaintiff Dep. p. 69.

Braxton went to his car to complete his paper work, and when he returned he asked  Plaintiff if he

could search the car, and Plaintiff refused consent to search. Id. at ¶13; Plaintiff Dep. p.73. Braxton

then called for a drug dog to perform a sniff of Plaintiff's vehicle.  Braxton Aff. ¶ 14. He also called

for back-up, and Defendant Curtis Hickman was the first deputy to arrive on the scene. Id. at ¶15.

Hickman averred he arrived at the scene around 7:30 a.m. and Plaintiff estimated it was approximately

thirty minutes from the beginning of the stop, which would be approximately 7:40 a.m.  Hickman Aff.

¶ 2; Plaintiff Dep. p. 76.

Braxton averred that Defendant Kip Coker arrived with the drug dog approximately thirty

minutes after Braxton called for the drug dog.  Braxton Aff. ¶ 16.  Plaintiff testified that he arrived

approximately an hour after the initial stop.  Plaintiff Dep. p. 79.    Kip Coker walked his drug dog

around Plaintiff's car, and it alerted on the drivers door of Plaintiff's car. Id. at ¶17; Plaintiff Dep.

p.101.  Kip Coker and Braxton then searched the interior of Plaintiff's car, and Hickman searched the

trunk.   Braxton  Aff.  ¶  18;  Plaintiff  Dep.  pp.102-103;  Kip  Coker  Aff.  ¶  10;  Hickman  Aff.  ¶  9.

Defendant Pat Coker arrived at some point, and stood with Plaintiff during the search.  Braxton Aff.

¶ 19; Plaintiff Dep. p.89.

-3-

When the officers could not find any drugs, Plaintiff was told he was free to leave, and he left sometime after 9:00 a.m. that morning.  Braxton Aff. ¶¶ 20-21; Kip Coker Aff. ¶¶12-13; Hickman Aff. ¶¶ 11-12.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.  Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present

evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Plaintiff's Allegations

Plaintiff alleges that Defendants violated his constitutional right to be free from unreasonable search and seizure as protected by the Fourth Amendment during the traffic stop on June 16, 2010. Plaintiff also alleges that Defendants engaged in racial profiling in violation of the Equal Protection Clause of the Fourteenth Amendment, conspired to violate his constitutional rights, and violated unspecified rights protected by the Fifth Amendment.

Plaintiff's claims are before the court pursuant to 42 U.S.C. § 1983. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), quoting Baker v. McCollan, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). A legal action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999).

### B.    Claims Against Defendants in their Official Capacities

Defendants argue that Plaintiff's claims for monetary damages are barred to the extent he brings them against Defendants in their official capacities. "Neither a State nor its officials acting in

their official capacities are 'persons' under § 1983." <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). In South Carolina, it is well settled that a sheriff and his deputies are state officials. <u>Cone v. Nettles</u>, 308 S.C. 109, 417 S.E.2d 523 (1992) (sheriffs and sheriff deputies are state officials, and therefore, are not amenable to suit for monetary damages in their official capacities); <u>see also</u> <u>Gulledge v. Smart</u>, 691 F. Supp. 947 (D.S.C. 1988). It is undisputed that Defendant Garrett is the duly elected Sheriff of Clarendon County and Defendants Surette, Braxton, Hickman, Pat Coker, and Kip Coker were working in the course and scope of their employment with the Sheriff of Clarendon County at all times relevant to this action. Accordingly, summary judgment is appropriate on Plaintiff's claims for monetary damages against these Defendants in their official capacities.

### C.    Fourth Amendment Claim

Plaintiff asserts that Defendants improperly detained him and searched his vehicle in violation of his Fourth Amendment rights. The Fourth Amendment proscribes "unreasonable searches and seizures." U.S. Const. Amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." <u>Brendlin v. California</u>, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (citation, quotation, and emphasis omitted). To determine whether Defendants actions during the traffic stop were violative of Plaintiff's Fourth Amendment rights, it is necessary to evaluate each section of the traffic stop individually.

### 1.    Initial Traffic Stop

"[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the

resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (citation omitted); see also Berkemer v. McCarty, 468 U.S. 420, 436–37, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (same); Colorado v. Bannister, 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980) (per curiam) (same).   Therefore, such stops must be reasonable under the circumstances. Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.E.2d 89 (1996).   "As a general matter, the decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred," id., or "a reasonable suspicion supported by articulate facts that criminal activity may be afoot," United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotation marks omitted); Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As long as the officer has a reasonable suspicion that even a minor traffic offense has occurred or is occurring, the stop of the vehicle is constitutionally permissible. See United States v. Hassen El, 5 F.3d 726, 730 (4th Cir.1993)  Police officers can temporarily detain a motorist when they have probable cause to believe the motorist violated a traffic ordinance, even if the officers have some other motivation to stop the motorist. Whren v. United States, 517 U.S. at 810.

Defendant Braxton stopped Plaintiff's vehicle for having a non-functioning light.   South Carolina law provides that "[n]o person shall drive or move on any highway any vehicle unless the equipment thereon is in good working order . . . ."  S.C. Code Ann. § 56-5-5310.  Plaintiff received a warning ticket for this offense.  Plaintiff admitted during his deposition that the light on the right front of his vehicle was dim in comparison to the light on the left side of his vehicle and that a reasonable person could have believed that the light was not functioning.  Plaintiff Dep. pp. 67-68; 199-200.  In fact, Plaintiff concedes that a basis existed for the initial stop.  Plaintiff Dep. p. 200. Thus, it is undisputed that probable cause existed for Defendant Braxton to believe that Plaintiff had committed a traffic violation and the initial stop was lawful.

### 2.    Detention Beyond Initial Traffic Stop

Plaintiff also argues that the interrogation and detention following the initial traffic stop was unlawful.  An officer may request a driver's license and vehicle registration, run a computer check, and issue a citation as part of a routine traffic stop, but "[a]ny further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has reasonable suspicion of a serious crime." United States v. Rusher, 966 F.2d 868, 876–77 (4th Cir.1992).  While a precise articulation of what constitutes "reasonable suspicion" is "not possible," Ornelas v. United States, 517 U.S. 690, 695 (1996), the "reasonable suspicion" standard is "less demanding than probable cause." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). In United States v. Branch, 537 F.3d 328, 336-37 (4th Cir. 2008), the Fourth Circuit set forth a framework to guide judicial evaluation of an investigatory detention beyond the scope of an initial stop.

First, in order to justify the extension of a traffic stop beyond its initial purpose, the "officer must simply point to 'specific and articulable facts which, taken together with rational inferences from those facts,' evince more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Id. at 336 (citing Wardlaw, 528 U.S. at 124; Terry, 392 U.S. at 27 (internal quotations omitted)). Second, "a court must take a common-sense and contextual approach." Id. (citing Ornelas, 517 U.S. at 695–96; see also United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993)). This is not a technical concept, "[t]hus, context matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances." Id. When making this common sense analysis, the Branch court also warned that consideration should be made for the training and expertise of police officers. Id. at 336-337 (citations omitted). Ultimately, the "judicial review of police action should not serve as a platform for 'unrealistic second-guessing' of law enforcement judgment calls." Id. at 337 (citations omitted). Third,

a court's evaluation of an officer's decision to extend a traffic stop should consider the totality of the circumstances as known to the officer. "A set of factors, each of which was individually 'quite consistent with innocent travel,' could still, 'taken together,' produce a 'reasonable suspicion' of criminal activity. Id. at 337 (citations omitted). "It is the entire mosaic that counts, not single tiles." Id. (citations omitted). Fourth, a police officer's decision to detain an individual must be subjected to an objective evaluation. Id. The constitutionality of a detention turns "not on the officer's actual state of mind . . . but rather on 'an objective assessment of the officer's actions.'" Id. (citing Maryland v. Macon, 472 U.S. 463, 470–71 (1985); Scott v. United States, 436 U.S. 128, 137 (1978)). "In other words, if sufficient objective evidence exists to demonstrate reasonable suspicion, a Terry stop is justified regardless of a police officer's subjective intent." Id.

Braxton avers that he became suspicious of criminal activity upon approaching Plaintiff's vehicle. Braxton Aff. ¶¶ 4-5. He asserts that Interstate 95 is a well-known corridor for drug carriers. Braxton Aff. ¶ 10; see also United States v. Brugal, 209 F.3d 353, 358 n.5 (4th Cir.2000). "An area's disposition toward criminal activity is an articulable fact ... that may be considered along with more particularized factors to support a reasonable suspicion." United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir.1997)(quotation omitted). Braxton avers that he has been trained to observe signs of possible criminal activity on a drug corridor like I-95, Braxton Aff. ¶ 6. Plaintiff argues that Braxton's training records do not reveal any such training. Response (Document # 176) p. 16.

Braxton points to numerous, specific facts which led him to suspect criminal activity. Plaintiff's vehicle appeared to Braxton to be lived in, and Plaintiff appeared disheveled. Braxton Aff. ¶ 7. Braxton observed food in the back floorboard of Plaintiff's vehicle. Braxton Dep. p. 17. Plaintiff admitted that he had driven through the night, slept in his car for several hours just prior to the stop, and had not showered. Plaintiff Dep. pp. 55-58. Braxton avers that Plaintiff had three cell phones in

his center console in plain view. Braxton Aff. ¶ 8; Braxton Dep. p. 17. However, Plaintiff asserts that two of his three cell phones were located in one of his bags and were not discovered until after the officers searched his bags. Response (Document # 176) pp. 10, 11; see also Plaintiff Dep. p. 106.

Braxton also avers that Plaintiff was breathing heavily and sweating and appeared nervous. Braxton Aff. ¶ 7; Braxton Dep. p. 17. Braxton noticed that Plaintiff's hands were shaking when he handed Braxton his driver's license and registration information. Braxton Dep. p. 17. Plaintiff denies exhibiting any of this behavior. Response pp. 3-5. Specifically, Plaintiff asserts that he is a retired soldier and supervisory police officer and has been trained to control his fears and emotions and does not sweat. Id. at pp. 4, 5. He asserts that he was not shaking nor was he nervous. Id. at p. 5.

Braxton also noted that Plaintiff hesitated when answering simple questions such as his destination and the names of his children he was going to visit. Braxton Aff. ¶¶ 10-11; Braxton Dep. p. 18. Plaintiff asserts that this is a false statement. Response pp. 13, 14. Braxton avers that Plaintiff was unable to tell him exactly where in Albany, Georgia[3] he was headed. Braxton Aff. ¶ 10; Braxton Dep. p. 18. Plaintiff argues that this statement is inconsistent with the statement included in Incident Report completed by Braxton dated June 16, 2010. Response p. 14; Incident Report (attached as Ex. C to Plaintiff's Response). In the Incident Report, Braxton states "Deputy Braxton asked Mr. Watty were [sic] he was going in casual conversation. Mr. Watty hesitated as if he was not real sure were [sic] he was heading. Mr. Watty stated Albany, Georgia." Id. In fact, Plaintiff argues that this is the only factor Braxton included in the Incident Report that is dated the same day as the incident. Plaintiff argues that the remaining factors cited by Braxton, such as the lived in look of Plaintiff's vehicle, his nervous appearance and behavior, and the three cell phones, were not included in the Incident Report

---

[3]Braxton notes that I-95 is not the most direct route to Albany, Georgia. Braxton Aff. ¶ 10.

and were "manufactured" after this litigation.  Response p. 12, 14.

While Braxton names several factors he took into consideration when deciding to extend the traffic stop beyond its initial purpose, as discussed above, Plaintiff disputes many of the factors.  The only undisputed factors set forth by Braxton are that Plaintiff's vehicle appeared "lived-in" and that Plaintiff was traveling on I-95 from New York.  These factors alone are insufficient to create reasonable suspicion of criminal activity.  As noted by the district court for the Eastern District of Virginia, "the Fourth Circuit has stressed its significant concerns with the government's proffering 'whatever facts are present, no matter how innocent, as indicia of suspicious activity.'"  U.S. v. Santiago, - - - F.Supp.2d - - -, 2012 WL 2343281, *7 (E.D.Va. June 19, 2012) (citing United States v. Powell, 666 F.3d 180, 182 (4th Cir.2011);  United States v. Massenburg, 654 F.3d 480, 482 (4th Cir.2011); United States v. Digiovanni, 650 F.3d 498, 512 (4th Cir.2011)).  In Santiago, the court noted that

> the officer's reliance on fast food bags to show an unwillingness to stop and, therefore, the potential for criminal activity is baseless. Fast-food eateries proliferate along our nation's interstate highways because many travelers driving several hundred miles want to eat quickly and get on with their trips. Rather than litter the highways, many motorists keep the trash from their hasty meals in their cars. Moreover, given that most of the defendants' drive occurred late at night, fast-food joints were likely the only places open to them. The food wrappers mean nothing.

Id. at *8.  The court also addressed the fact that the defendants were traveling on Interstate 95, stating, "the fact that the defendants travelled on I–95 from Florida to Philadelphia does not indicate criminal activity. While some people undoubtedly use I–95 for unlawful purposes, literally millions of cars drive on the road each year. Interstate highways were created to allow Americans to get to places quickly." Id.  The officer in Santiago also asserted signs of nervousness, a new GPS device, one piece of luggage for two people, a short turn-around time for the trip, and conflicting stories regarding the trip as indicators of suspicious activity.  Id. at *7.  The court concluded that the factors relied upon by

-11-

the officer did not eliminate a substantial portion of innocent travelers, and, thus, were insufficient to create reasonable suspicion of criminal activity.  Id. at *8 (citing Digiovanni, 650 F.3d at 513; United States v. Brugal, 209 F.3d 353, 358 (4th Cir.2000)).

Here, several disputes of fact exist to prevent this court from concluding as a matter of law that Braxton had reasonable suspicion of criminal activity to extend the initial traffic stop into an investigatory stop.  Accordingly, the undersigned recommends that Defendants' Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment be denied as to Plaintiff's Fourth Amendment claim.  However, in the event the district judge disagrees with this recommendation, Plaintiff's Fourth Amendment claim is discussed further below.

### 3.    Detention While Awaiting the Arrival of the Drug Dog

Upon returning to Plaintiff's vehicle after writing the warning ticket, Braxton asked Plaintiff if he would consent to a search of his vehicle.  Braxton Aff. ¶ 13.  When Plaintiff declined to allow Braxton to search his vehicle, Braxton informed Plaintiff that he would have a K-9 unit dispatched to the scene.  Id.

An investigatory stop must last no longer than is necessary to effectuate the purpose for the stop.  United States v. Boone, 245 F.3d 352 (4th Cir. 2001). The scope of such a stop is "strictly tied to and justified by the circumstances which rendered its initiation permissible." Terry, 392 U.S. at 19. Because no "hard-and-fast time limit" exists for a permissible investigatory stop, a court must rely on "common sense and ordinary human experience" in assessing whether the duration of the stop violates the Fourth Amendment. United States v. Sharpe, 470 U.S. 675, 685–86 (1985). The Sharpe court noted that if the purpose underlying the Terry stop, which is investigating criminal activity, is to be accomplished, officers must be able, in certain circumstances, to detain individuals for a longer period of time. Id.  The detention must be no longer than that which allows police to diligently pursue a means

of investigation that is likely to confirm or dispel their suspicions quickly." Sharpe, 470 U.S. at 686.

The Fourth Circuit has set forth several factors to consider when analyzing the reasonableness of a detention for an investigatory stop: the duration of time the suspect is delayed by the stop, whether the police acted diligently, whether the detention of the subject of the search was unnecessarily prolonged, whether the authorities make it absolutely clear that they plan to reunite the suspect and his possessions at some future time and how they plan to do it, and the importance of the governmental interest alleged to justify the intrusion. U.S. v. Alpert, 816 F.2d 958, 964 (4th Cir. 1987)(internal citations omitted).

In this case, the record reveals that Braxton initially stopped Plaintiff at 7:11 a.m. Braxton Aff. ¶ 2; CADVisor (attached as Ex. B to Plaintiff's Response). When Braxton returned to Plaintiff's car with the warning ticket, and requested to search the car, the stop had been going on for approximately 15-20 minutes. Braxton Aff. ¶13. When Plaintiff refused consent to search, Braxton indicated that he would have a K-9 unit dispatched to the scene to walk around Plaintiff's vehicle. Id. Braxton attempted to make contact with Defendant Kip Coker, the K-9 handler for the Sheriff's Department, but he was unable to reach him. Id. at ¶ 14. Thus, he contacted Defendant Peter Surette, to see if he could help him contact Kip Coker. Id. At approximately 7:30 a.m., Kip Coker received a call from Surette as he was getting out of the shower and getting ready for work. Kip Coker Aff. ¶ 4. Surette called Braxton back to advise him that he had spoken to Kip Coker, who was going to bring the drug dog. Braxton Aff. ¶ 14. Kip Coker got dressed as quickly as he could, put Tess, the certified drug dog, in his car, and drove to the place of the stop on I-95. Kip Coker Aff. ¶ 6. It took Kip Coker approximately thirty minutes to finish getting ready and drive to the place of the stop, and he arrived on the scene at approximately 8:00 a.m. Id. at ¶¶ 6-7; Braxton Aff. ¶ 16. When he arrived on the scene, Kip Coker activated the video camera in his patrol car. Kip Coker Aff. ¶ 7. The video of the

-13-

traffic stop from Kip Coker's patrol car indicates that it began at 8:08:21.  Video (attached as Ex. B to Kip Coker Affidavit).  Thus, Kip Coker arrived on the scene with the drug dog approximately 57 minutes after Braxton initiated the stop.  See Plaintiff Dep. p. 79.

Considering of the factors set forth in Alpert, the delay in waiting for the arrival of the drug dog was not unreasonable under the circumstances.  The drug dog arrived approximately one hour after the initial stop and approximately thirty minutes after Braxton called for the drug dog.  There is no dispute in the record that Braxton was anything other than diligent in his investigation.  He avers that he tried to make everything happen as timely as possible during the stop, so as not to delay the Plaintiff any longer than necessary.  Braxton Aff. ¶ 22.  Likewise, Kip Coker was diligent as well in his response to the call for a drug dog, even bypassing the Sheriff's Department to come straight to the scene when called.  Further, Plaintiff fails to point to sufficient evidence that would show that any of the Defendants unnecessarily prolonged his detention.  In addition, upon Plaintiff's refusal to allow a search of his vehicle, Braxton notified Plaintiff that he would be calling for a drug dog, Braxton Aff. ¶ 13.  When Kip Coker arrived, he informed Plaintiff of the procedure involved with a drug dog sniff of his vehicle.  Kip Coker Aff. ¶ 7.  Thus, Plaintiff was aware of what the officers were doing.  Finally, there is no question that the prevention of drug trafficking is an important government interest.

In addition, numerous courts have held that a thirty minute delay (here, while awaiting the drug dog) or even an hour long delay (here, from the beginning of the stop until the time the drug dog arrived) is not so great as to exceed the brevity requirement of an investigative stop. See United States v. Alpert, 816 F.2d 958 (4th Cir. 1987)(finding that 50 minute detention of individual's luggage while waiting for narcotics dog was no longer than the circumstances of the case required); United States v. McFarley, 991 F.2d 1188 (4th Cir. 1993)(holding that 38-minute detention of an individual and his luggage while awaiting for a drug dog is not per se unreasonable); United States v. Hearn, 2011 WL

6229561 (4th Cir. 2011) (officer's reasonable suspicion justified detaining an individual for between 20 and 25 minutes after issuing a warning ticket pending the arrival of a drug-detecting canine); United States v. Wilson, 1995 WL 10224 (4th Cir. 1995)(finding that agents 45 minute detention of an individual was temporally reasonable based upon their reasonable suspicion of criminal activity); United States v. McBride, 2010 WL 754769 (D.S.C. 2010)(approximately 55 minute detention of an individual's vehicle while awaiting the arrival of a narcotics dog was not unreasonable); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988)(a 50 minute delay was not unreasonable); United States v. Glover, 957 F.2d 1004, 1012–13 (2nd Cir. 1992)(a 30 minute detention was reasonable because a "narcotics dog was on the way"), Cresswell v. State, 564 So.2d 480, 481 (Fla. 1990)(a 45 minute detention was reasonable because it was "the time necessary to obtain a narcotics dog"), State v. Gant, 637 So.2d 396, 397 (La. 1994) (a 30 minute detention was reasonable while a drug dog was brought to the scene); United States v. Sullivan, 903 F.2d 1093, 1097–98 (7th Cir.1990)(45 minute detention pending arrival of narcotics dog was not impermissible); United States v. Sterling, 909 F.2d 1078, 1081, 1085 (7th Cir. 1990)(75 minute delay pending arrival of narcotics dog was not unreasonable); United States v. Borrero, 770 F.Supp. 1178, 1189–91 (E.D.Mich. 1991)(70 minute detention pending arrival of narcotics dog was not unreasonable).  Likewise, in the present case, the delay while awaiting the drug dog was not excessive.

### 4.    Search of Plaintiff's Vehicle Following Alert by Drug Dog

When Kip Coker arrived at the scene, he went to speak to Plaintiff to make sure he still refused to consent to search, and also to explain the procedure of the dog sniff of his car.  Kip Coker Aff. ¶ 7. He then returned to his patrol car and got his K-9, Tess,  out of the car to perform the sniff of the exterior of Plaintiff's vehicle.  Id. at ¶ 8.  Kip Coker walked Tess around Plaintiff's car, and Tess gave a positive alert for drugs by scratching on the driver's door.  Id. at ¶ 9.  Kip Coker then took Tess back

to his patrol car, advised Plaintiff that the dog had given a positive alert for drugs, and began to search the vehicle with Braxton. Id. at ¶ 10. Plaintiff did not witness the dog alert on the vehicle. He asserts that one of the other officers that had arrived at the scene, Pat Coker, kept him distracted to prevent him from paying attention to what was going on with the drug dog. Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment p. 9. Nevertheless, Plaintiff presents no evidence that the drug dog did not alert on the vehicle.

A police officer may search a vehicle without a warrant if "probable cause exists to believe it contains contraband" and the vehicle is "readily mobile." Maryland v. Dyson, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam) (internal quotation marks omitted). Such a search may cover all areas of the vehicle, including any of its "secret compartments." United States v. Bullock, 94 F.3d 896, 899 (4th Cir.1996). The Fourth Circuit has repeatedly held that "[t]he detection of narcotics by a trained dog is generally sufficient to establish probable cause." United States v. Koon Chung Wu, 217 Fed.Appx. 240, 245 (4th Cir. 2007)(citing United States v. Robinson, 707 F.2d 811, 815 (4th Cir. 1983)); see also United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994)("When the dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed."). Evidence of a dog's "training and certification [is] enough by itself to establish [the dog's] reliability so that his positive alerts for controlled substances establish probable cause." Id.; see also United States v. Stanley, 4 Fed.Appx. 148, 150 (4th Cir. 2001)(testimony about officer's "familiarity with the dog and its training [was] sufficient to establish the dog's reliability").

Defendant Kip Coker's 2010 K-9 Narcotic Detection Training certificate and the Coker–Tess narcotic detection team training certificates from 2010 establish Tess' reliability in detecting the presence of illegal drugs. Drug Dog Training Records (attached as Exhibit A to Kip Coker Affidavit). Therefore, once Tess alerted on Plaintiff's vehicle, Defendants had probable cause to search it,

-16-

including the trunk.  It is well recognized that a "dog's alerting [at a driver's door] [is] sufficiently close to the trunk to give [the officer] probable cause to believe it contained contraband." United States v. Kelly, 592 F.3d 586, 592 (4th Cir. 2010)(citing United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002). "Probable cause is simply not so exacting a standard that it requires a dog to be able to pinpoint the location of drugs within a foot or two." Id.  Plaintiff fails create an issue of fact as to whether the search of his vehicle was violative of the Fourth Amendment, provided, arguendo, the extension of the initial stop was proper.

Nevertheless, as discussed above, issues of fact exist regarding whether Braxton had reasonable suspicion of criminal activity to extend Plaintiff's traffic stop beyond its initial purpose.  Thus, summary judgment is not appropriate on Plaintiff's Fourth Amendment Claim.

### D.    Fourteenth Amendment Claim

Plaintiff also alleges a cause of action for violation of his equal protection rights under the Fourteenth Amendment.  Specifically, Plaintiff alleges that he was subjected to racial profiling when he was stopped on June 16, 2010.  Plaintiff testified in his deposition that the Clarendon County Sheriff's Department and South Carolina law enforcement in general have a history of such conduct and referenced research he had done on the internet.  Plaintiff Dep. pp. 165-67.  He also testifies that he was subjected to racial profiling because Braxton looked at him before stopping him and because he did not give them probable cause to search him, but they did anyway.  Plaintiff Dep. p. 167.

"[T]o prevail on an equal protection claim in the racial profiling context, the Plaintiff would have to show that the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose." Wallace v. Johnston, No. 9:05-cv-2950-MBS, 2007 WL 1068477, *13 (D.S.C. March 30, 2007) (citing Bradley v. United States, 299 F.3d 197, 205 (3d Cir.2002)).  "To prove discriminatory effect, Plaintiff must show that he is a member of the protected

class and that 'similarly situated' persons in an unprotected class were not stopped and/or prosecuted for motor vehicle violations.  In other words, to establish discriminatory effect, an African-American claimant must demonstrate that a law or regulation was enforced against him, but not against similarly situated individuals of other races." Id. (citing Bradley, 299 F.3d at 205; United States v. Armstrong, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); Chavez v. Illinois State Police, 251 F.3d 612, 636 (7th Cir.2001); United States v. Hayes, 236 F.3d 891, 895 (7th Cir.2001)).  "The standard for establishing a selective enforcement claim is 'demanding' and requires evidence that clearly contradicts the presumption that officers have not violated equal protection." United States v. Suarez, 321 Fed. Appx. 302, 305 (2009) (citing United States v. Armstrong, 517 U.S. 456, 463-65 (1996)). Here, Plaintiff has failed to present evidence of similarly situated persons outside his protected class that were not stopped under the same circumstances.  Therefore, summary judgment in favor of Defendants is proper on Plaintiff's Fourteenth Amendment claim.

> **E.    Fifth Amendment Claim**

In his Complaint, Plaintiff makes vague references to a violation of his Fifth Amendment rights.  When asked about this claim in his deposition, Plaintiff testified that Defendants "made up their minds that [he] had drugs."  Plaintiff Dep. p. 168.  It is possible that Plaintiff is raising a racial profiling claim under the Fifth Amendment in addition to the Fourteenth Amendment.

The Fourth Circuit has recognized that "although an officer's 'motive[ ] for stopping an automobile that was violating traffic laws is irrelevant to the legitimacy of the stop under a Fourth Amendment analysis, ... racially motivated law enforcement can violate the equal protection component of the Fifth Amendment's Due Process Clause.'" United States v. Hammond, 353 Fed. Appx. 877, 879 (4th Cir.2009)(quoting United States v. Bullock, 94 F.3d 896, 899 (4th Cir.1996)); see also United States v. Suarez, 321 Fed. Appx. 302, 305 (2009) ("Allegations of racially motivated

law enforcement implicate the Equal Protection Clause rather than the Fourth Amendment."). The required showing is the same as that discussed above. See id. (quoting United States v. Armstrong, 517 U.S. 456, 465 (1996))(holding that to establish a claim of racial profiling, "'[t]he claimant must demonstrate that the [enforcement policy] had a discriminatory effect and that it was motivated by a discriminatory purpose.... To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted.'"). Thus, for the same reasons, summary judgment in favor of Defendants is appropriate on this claim as well.

F.     **Civil Conspiracy Claim**

Plaintiff also alleges a cause of action for civil conspiracy. To establish a civil conspiracy under § 1983, Plaintiffs must prove that two or more persons acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Plaintiffs' deprivation of a constitutional right. Hinkle v. City of Clarksburg, WV, 81 F.3d 416, 421 (4th Cir.1996). To meet the "weighty burden to establish a civil rights conspiracy[,]" .... "[the plaintiff] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." Id. Thus, the "evidence must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Id. Isolated acts by defendants that fail to evidence a shared understanding will not suffice to survive a motion for summary judgment. Id. at 421–23.

In his deposition, Plaintiff testified that the basis for his conspiracy claim was "the way the officers went about doing things." Plaintiff Dep. p. 164. However, Plaintiff has produced insufficient evidence of an agreement to commit any acts, wrongful or otherwise, nor sufficient evidence that would give rise to an inference that each Defendant shared the same conspiratorial objective. Therefore, Plaintiff's civil conspiracy claim fails.

-19-

### G.     Supervisory Liability

Plaintiff includes Sheriff Randy Garrett and Captain Peter Surette as Defendants in this action. However, they were not present at the stop nor does Plaintiff allege any personal involvement by these Defendants.[4]   The doctrines of vicarious liability and respondeat superior are not generally applicable in § 1983 actions. See Polk Cnty. v. Dodson, 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) ("Section 1983 will not support a claim based on a respondeat superior theory of liability.") (citing Monell v. Dep't of Social Serv., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Section 1983 liability on the part of a supervisory defendant requires a showing that the supervisory defendant tacitly authorized or was indifferent to the official's actions which violate constitutional rights. Miltier v. Beorn, 896 F.2d 848 (4th Cir.1990).  In this case, Plaintiff has failed to present sufficient evidence that either of these Defendants had any knowledge of any specific conduct by their subordinates that violate constitutional rights. To the contrary, Sheriff Garrett testified in his Affidavit that all of the Defendants involved with the Plaintiff were properly trained and supervised, and he was not aware of any other problems with them during a stop of a motorist. Garrett Aff.  ¶¶ 4-6.  Therefore, Plaintiff's claims against Defendants Garrett and Surette fail for lack of personal involvement or vicarious liability.

### H.     Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), established the standard which

---

[4]Defendant Garrett had no personal involvement in the traffic stop involving the Plaintiff and only learned of the situation after receiving a letter from the Plaintiff.  Garrett Aff. ¶¶ 2-5. Defendant Surette was in North Carolina at the time of the traffic stop and only learned of the situation when he was contacted by Defendant Braxton requesting a K-9 unit to respond to the scene. Surette Dep. pp.4–5.

-20-

the court is to follow in determining whether the defendant is protected by this immunity. The Harlow Court held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow, 457 U.S. at 818.

In addressing qualified immunity, "a court must first determine whether the Plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); see also Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir.2000). Further, "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." Porterfield v. Lott, 156 F.3d 563, 567 (4th Cir.1998).

In Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992), the Fourth Circuit Court of Appeals further explained the theory of qualified immunity:

> Governmental officials performing discretionary functions are shielded from liability for money damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Moreover, there are two levels at which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which this right applies to the actions of the official must also be apparent. Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.

As discussed in detail above, Plaintiff fails to present evidence sufficient to show that Defendants violated his Fifth or Fourteenth Amendment rights or engaged in a civil conspiracy during the traffic stop. Nevertheless, assuming arguendo Plaintiff's constitutional rights had been violated, the record before the court shows that as to Plaintiff and the specific events at issue, Defendants performed

-21-

the discretionary functions of their official duties in an objectively reasonable fashion. They did not transgress any "bright lines" of statutory or constitutional rights. Thus, Defendants are entitled to qualified immunity on Plaintiff's Fifth and Fourteenth Amendment and civil conspiracy causes of action.

However, as discussed above, genuine issues of material fact exist on Plaintiff's Fourth Amendment claim as to whether Braxton had reasonable suspicion of criminal activity to justify extending Plaintiff's traffic stop into an investigatory stop.   "While the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred ... must be reserved for trial.' " Willingham v. Crooke, 412 F.3d 553, 559 (4th Cir.2005) (quoting Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir.1992)). Thus, Defendant Braxton is not entitled to qualified immunity on Plaintiff's Fourth Amendment claim.

## V.     CONCLUSION

For the reasons discussed above, it is recommended that Plaintiff's Amended Motion for Summary Judgment (Document # 155) be denied.  It is further recommended that Defendants' Motion for Summary Judgment (Document # 156) be granted as to all claims against all Defendants in their official capacities and all claims against Defendants Sheriff Randy Garrett, Captain Peter Surette, Deputy Sheriff Curtis Hickman, Deputy Sheriff Pat Coker and Deputy Sheriff Kip Coker.  It is further recommended that Defendants' Motion for Summary Judgment (Document # 156) be granted as to Plaintiff's Fifth and Fourteenth Amendment claims and his civil conspiracy claims against Defendant Deputy Sheriff Brandon Braxton but denied as to Plaintiff's Fourth Amendment Claim against

Braxton.[5]

                          s/Thomas E. Rogers, III

                          Thomas E. Rogers, III

                          United States Magistrate Judge

January 3, 2013
Florence, South Carolina

**The parties are directed to the important notice on the following page.**

---

[5]In sum, it is recommended that Defendants' Motion for Summary Judgment be granted as to all claims except the Fourth Amendment claim against Defendant Braxton.